CONTINENTAL ILLINOIS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Continental Illinois Corp. v. Commissioner
Docket No. 5931-83
United States Tax Court
T.C. Memo 1989-468; 1989 Tax Ct. Memo LEXIS 468; 57 T.C.M. (CCH) 1464; T.C.M. (RIA) 89468; August 30, 1989
*468 Held: Respondent's hearsay objections to receipt in evidence of certain written certifications overruled, with limited exceptions. Respondent's competency and hearsay objections to schedules attached to those written certifications overruled in every instance except one in which respondent waived those objections by using the schedule for his own purposes. Petitioner's hearsay and competency objections sustained with respect to one particular exhibit and considered abandoned with respect to the other exhibits to which petitioner raised such objections. Petitioner's relevance objections to receipt in evidence of certain documents overruled. Respondent's objection to receipt in evidence of untranslated financial statements of a foreign borrower sustained. Edward C. Rustigan, Joel V. Williamson, Roger J. Jones, for the petitioner. Beth L. Williams, Robert A. Bedore, Cynthia J. Mattson, Grace L. Perez-Navarro, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: By statutory notice of deficiency dated December 20, 1982, respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1975
$ 1,899,880 1976
84,088
1977
36,741,206
1978
15,844,349
Pursuant *469 to joint motion, the Brazilian foreign tax credit issue was severed from the other issues, consolidated with another case, and tried at a special trial session in Washington, D.C. See Continental Illinois Corp. v. Commissioner, T.C. Memo. 1988-318. By order dated April 12, 1989, the issue known as the "Iranian Loss" issue was severed from the remaining issues in the case. [1] Those remaining issues known as the "CAP Loan" issue and the "Net Loan" issues, which involve primarily the years 1977 through 1979, were tried at a special trial session in Washington, D.C., which commenced on May 8, 1989. As a preliminary matter, certain evidentiary issues which arose in connection with the "Net Loan" issues must be resolved. In completing the stipulations for trial, both parties reserved various objections to certain exhibits attached to the Third Stipulation of Facts (Net Loan Issues) and the First Supplement to Third Stipulation of Facts (Net Loan Issues). Prior to trial, we requested that each party submit, in addition to a pretrial memorandum, a memorandum of law specifically addressing the hearsay and competency *470 objections raised with respect to particular exhibits referred to herein. We postponed ruling on those objections and the other reserved objections until after trial in order to allow the parties an opportunity to fully present their arguments and until time was available to review the exhibits in light of the other evidence presented at trial. Prior to making findings of fact in this case, it is necessary to rule on the objections outstanding with respect to Exhibits 106-DB(1-4), 129-DY, 152-EV(1-3), 163(FG(1-2), 234-HY(2), 235-HZ(1-3), 238-IC, 239-ID, 259-IY, 275-JO, 276-JP, 289-KC, 290-KD(2), 291-KE(1-2), 294-KH, 295-KI, 297-KK(2), 298-KL(2-3), 300-KN(2-3), 302-KP, 353-MN(1-3), and 358-MS(1-2). This opinion is limited to the admissibility of those exhibits. Background
Continental Illinois National Bank and Trust Company of Chicago (CINB), a Federally incorporated national banking association wholly owned by petitioner, extended loans to foreign borrowers in the course of its regularly conducted banking activities. CINB generally priced those loans on one of two bases: a "net quoted" basis or a "gross quoted" basis. Pursuant to a net quoted loan agreement the borrower assumes *471 the obligation to pay any tax imposed by the borrower's country on interest payments to the lender as consideration to be paid for the loan in addition to the net quoted rate of interest. Pursuant to a gross quoted loan agreement the borrower agrees to pay the lender a gross quoted rate of interest to which the lender is entitled before the imposition of any tax on the lender by the borrower's country. If any such tax is imposed on the lender, the borrower pays the lender the gross quoted interest net of tax. [2] Not every country in which CINB lent money imposed a tax on interest paid to foreign lenders. For taxable years ending prior to 1977, CINB neither "grossed up" [3] *473 the interest income from net quoted loans on account of the assumption by borrowers of the obligation to pay tax imposed with respect to that income nor claimed any foreign tax credits in connection with those loans. Because no foreign tax credits were previously being claimed *472 with respect to net quoted loans, no need existed for the collection of foreign tax credit documentation. However, CINB subsequently commenced an extensive study of net quoted loans outstanding from 1969 through 1977 for the purpose of determining with respect to each of those years the amount of the gross-up which should have been included in interest income and the amount of foreign tax credit which should have been claimed. CINB later added net quoted loans outstanding during 1978 and 1979 to the study, which took approximately 3 years to complete. CINB instituted the net quoted loan study in February 1978, in part because no foreign tax credit substantiation system was in place before the tax treatment of net quoted loans was changed. Despite its efforts, CINB encountered difficulty in obtaining the sought-after documentation from all of the foreign borrowers. Only certain net quoted loan agreements required borrowers to provide CINB with tax receipts documenting the withholding and payment over of tax on its behalf. [4] *474 Further problems stemmed from the reluctance of borrowers to cooperate and the mere passage of time. Nevertheless, CINB succeeded in documenting a considerable amount of the foreign tax credit which it claimed with respect to net quoted loans. In his notice of deficiency, respondent disallowed certain foreign tax credits claimed by CINB for 1977, 1978, and 1979. Some of those credits were disallowed because the underlying net quoted loan interest payments were wholly or partially exempt from foreign tax and other of those credits were disallowed for lack of substantiation. Based on the production by CINB of tax receipts and other unspecified documents, respondent subsequently allowed certain of the foreign tax credits which had been disallowed for lack of substantiation. CINB continued its documentation efforts in an attempt to substantiate satisfactorily certain other foreign tax credits disallowed by respondent and additional foreign tax credits which it claimed pursuant to its Second Amendment to Petition. CINB's most recent efforts yielded written certifications obtained from borrowers which respondent declined to accept as substantiation. During trial of the *475 "Net Loan" issues, petitioner offered those written certifications in evidence over the hearsay objections which respondent reserved in the stipulations. Those written certifications, hereinafter referred to as Borrower Letters, were offered as evidence of withholding and payment of foreign tax by borrowers on behalf of CINB. [5]
Admissibility of Borrower Letters
Rule 801(c)[6] defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Accordingly, the Borrower Letters fall within the definition of hearsay under Rule 801(c) and are not admissible unless such letters come within one of the exceptions to the hearsay rule set forth in Rules 803 and 804. See Rule 802. Petitioner argues that the Borrower Letters are admissible under the so-called "residual" hearsay exceptions set forth in Rules 803(24) and 804(b)(5). [7] *477 Respondent argues that such letters *476 fail to satisfy the requirements necessary for admissibility under the residual exceptions to the hearsay rule. The residual exceptions are identical in language and purpose, except that Rule 804(b)(5), like all Rule 804 hearsay exceptions, is subject to a general showing of the unavailability of declarant as a witness. Rule 803(24) requires no such showing. Respondent has nullified this distinction by conceding that the signatories of the Borrower Letters are unavailable within the meaning of Rule 804(a)(5). Therefore, both residual exceptions apply if the requirements which they have in common are satisfied. In order for the Borrower Letters to be admitted in evidence under the residual exceptions, petitioner must show with respect to each such letter that: 1. The statement has "circumstantial guarantees of trustworthiness" equivalent to those of the hearsay exceptions enumerated in Rules 803 and 804; 2. the statement is offered as evidence of a material fact; 3. the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; 4. the general purposes of the rules *478 of evidence and the interests of justice will be served by admission of the statement into evidence; and 5. the proponent of the statement has made it known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it. 4 Weinstein, Evidence, par. 803(24)[01], pp. 803-373-380 (1988 ed.); Goldsmith v. Commissioner, 86 T.C. 1134, 1139-1140 (1986), and the cases cited thereat. Respondent concedes that the proffered evidence satisfies the materiality and notice requirements of the residual exceptions but contends that none of the other three requirements are satisfied. Thus, we must decide whether those other requirements for the admissibility of hearsay under the residual exceptions are satisfied. Before turning our attention to the specific requirements at issue, we note the narrow intended application of the residual exceptions which is apparent from their legislative history, as expressed by the Senate Judiciary Committee: The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and *479 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. Such major revisions are best accomplished by legislative action. It is intended that in any case in which evidence is sought to be admitted under these subsections, the trial judge will exercise no less care, reflection and caution than the courts did under the common law in establishing the now-recognized exceptions to the hearsay rule. [S. Rept. 93-1277, 4 U.S. Code Cong. & Admin. News 7065-7066 (1974).] See Goldsmith v. Commissioner, supra at 1140 n. 10; see also United States v. Kim, 595 F.2d 755, 765 (D.C. Cir. 1979); United States v. Bailey, 581 F.2d 341, 346-347 (3d Cir. 1978). Although the residual exceptions are to be used very rarely and only in exceptional circumstances, we believe that such circumstances exist here. Moreover, "federal law favors the admission of probative evidence. In fact, 'The Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.' * * * Doubts 'must be resolved in favor of admissibility.'" United States v. Holladay, 566 F.2d 1018, 1020 (5th Cir. 1978), *480 cert. denied 439 U.S. 831 (1978), quoting Sabatino v. Curtiss National Bank of Miami Springs, 415 F.2d 632, 636 (5th Cir. 1969), cert. denied 396 U.S. 1057 (1970). Trustworthiness
In determining the trustworthiness of the Borrower Letters, we must assess "'the nature -- written or oral -- and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which it was made. * * * Also significant are the knowledge and qualifications of the declarant.'" Herdman v. Smith, 707 F.2d 839, 842 (5th Cir. 1983), quoting 4 Weinstein, Evidence, par. 803(24)[01]. We also have a duty to balance the need for the hearsay evidence, viz, the Borrower Letters, against the trustworthiness of that evidence. See Herdman v. Smith, supra; United States v. White, 611 F.2d 531, 538 (5th Cir. 1980), cert. denied 446 U.S. 992 (1980). In doing so, we conclude that the need for the Borrower Letters is paramount because the process of this Court does not extend to the nonparty foreign borrowers, and CINB, despite its efforts, was unable to procure other probative evidence from such borrowers on the points for which *481 their letters are offered. Cf. Karme v. Commissioner , 73 T.C. 1163, 1181 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984); United States v. Friedman, 593 F.2d 109, 119 (9th Cir. 1979). Furthermore, we believe that the Borrower Letters obtained under the circumstances described below have guarantees of trustworthiness sufficient to satisfy the requirements of the residual exceptions upon which petitioner relies. CINB initially sought the documentation necessary to substantiate foreign tax credits as part of its 3-year net quoted loan study. During trial preparation, CINB, with the assistance of petitioner's counsel, made additional efforts to obtain documentation to support certain foreign tax credits which it claimed. Petitioner's counsel retained Miguel Antonio Valdes (Valdes), an international tax partner with the accounting firm of Coopers & Lybrand, to visit borrowers in South America and Mexico on CINB's behalf. On those visits, most of which took place during 1987 and 1988, Valdes explained that CINB was involved in a dispute over foreign tax credits with the Internal Revenue Service and he always requested that the *482 borrowers provide him with tax receipts if such receipts were available. In the event tax receipts were unavailable, Valdes sought to document the withholding and payment over of foreign tax on behalf of CINB by obtaining written certifications from the borrowers. To ease the burden on the borrowers who were under no obligation to provide CINB with the documentation which it sought, representatives of CINB and petitioner's counsel prepared schedules for each borrower which purportedly showed the amount of interest withheld and paid over with respect to net quoted loans. Those schedules were based upon CINB's books and records and Valdes requested that the borrowers verify the schedules against their own books and records. Valdes also provided the borrowers with various form letters which petitioner's counsel prepared as a guide for borrowers making written certifications. CINB dispatched Frederick C. Yeager (Yeager), a vice president in charge of CINB's international tax department, on visits to borrowers in Asia. Letters requesting assistance in documenting the payment of tax on behalf of CINB were sent to borrowers in advance of Yeager's visits. After indicating in those letters *483 that the documentation was required by the Internal Revenue Service, CINB requested that the borrowers provide tax receipts, if available. In certain letters, CINB requested written certifications in the event tax receipts were unavailable and attached thereto an example of the type of certification which it expected to obtain. CINB also attached a schedule which purportedly showed the amount of interest withheld and paid over by the particular borrower together with a document certifying [8] that such schedule accurately reflected the amounts shown on its books and records. On his visits, Yeager discussed CINB's situation with the borrower representatives whom he met and renewed the request for tax receipts. If the borrower indicated that tax receipts were not available, Yeager requested a written certification regarding the withholding and payment over of tax by that borrower on CINB's behalf. Messrs. Valdes and Yeager, working together with representatives of CINB and petitioner's counsel, obtained Borrower Letters from high *484 ranking officers of foreign banks and corporations who were authorized to issue those letters because of their responsibility for or familiarity with the withholding tax practices of the entities which they represented. Although CINB declined in most instances to inform borrowers that documentation was being sought for use in litigation, all of the borrowers from whom it obtained Borrower Letters were aware of CINB's dispute with the Internal Revenue Service over foreign tax credits. We believe that awareness of such a dispute tended to impress upon borrowers the seriousness of the situation and the importance of telling the truth and we are not convinced that the officials who executed the Borrower Letters had any reason to falsify or misrepresent the matters asserted therein. Likewise, the Borrower Letters give no indication of being the product of faulty perception, memory, or meaning. United States v. Friedman, supra.Rather than blindly accepting the schedules based upon CINB's books and records and transmitting letters identical to the forms provided, the borrowers departed from those forms as necessary to reflect their own recollections and verifications of the facts purportedly *485 documented in their letters. In the instances where a Borrower Letter mirrors a particular form, we presume that that form was followed because it imparted the meaning intended by the borrower in disclosing the matters represented therein. We find nothing in the record to support respondent's contention that the Borrower Letters are self-serving statements made by borrowers with a keen interest in maintaining good relations with CINB. Nor do we agree with respondent's contention that the Borrower Letters are untrustworthy "because they were created specifically for purposes of this litigation with substantial input from petitioner's counsel and petitioner." Rather, we believe that CINB obtained the Borrower Letters out of necessity after its efforts to obtain tax receipts failed. The fact that no provision in the net quoted loan agreements required borrowers to provide CINB with documentation of withholding and payment over of tax on its behalf limited CINB's alternatives. [9] Its alternatives were further limited by the fact that the borrowers from whom documentation was sought were not subject to the process of this Court. Those limitations effectively put CINB in a position of *486 relying on cooperation from borrowers in documenting the foreign tax credits which it claimed. Thus, we find that by requesting written certification from borrowers and providing them with schedules and form letters CINB intended only to promote the cooperation of those borrowers by easing the burden of documenting the withholding and payment over of tax on its behalf. We find nothing in the record indicating that anyone acting on behalf of CINB intended to mislead borrowers or otherwise influence the content of the Borrower Letters. Respondent also contends that the Borrower Letters are untrustworthy because those letters are not accompanied by any contemporaneous corroborative evidence of the payment of tax by borrowers on CINB's behalf. Although a disagreement exists among the circuits as to the scope of a court's inquiry in determining "circumstantial guarantees of trustworthiness," we are constrained to reject respondent's contention under Golsen v. Commissioner , 54 T.C. 742, 757 (1970), *487 affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). The Seventh Circuit, the court to which an appeal of this case lies, has held that "the probability that the statement is true, as shown by corroborative evidence, is not, we think, a consideration relevant to its admissibility under the residual exception to the hearsay rule." Huff v. White Motor Corp., 609 F.2d 286, 293 (7th Cir. 1979); but see United States v. Bailey, 581 F.2d 341, 349 (3d Cir. 1978). Moreover, we are convinced that the Borrower Letters manifest the circumstantial guarantees of trustworthiness necessary to warrant their admission over respondent's hearsay objections without determining whether there is independent evidence to corroborate the matters asserted therein.
Probativeness
Respondent argues that the borrowers' books and records would be more probative evidence of the tax payments allegedly made on behalf of CINB than the Borrower Letters, some of which indicated that the matters asserted therein had been verified against such books and records. Respondent further argues that CINB's failure to request access to or copies of the relevant portions of borrowers' books and records constitutes *488 a basis for excluding the Borrower Letters. Respondent makes the same argument with respect to CINB's failure to seek evidence of withholding and payment over of tax on its behalf from the foreign tax authorities to whom such payments were purportedly made by the borrowers. Even assuming the probativeness of those other potential sources of evidence, we still reject respondent's arguments because we do not believe that such evidence was both available and procurable by CINB through reasonable efforts. In Goldsmith v. Commissioner, 86 T.C. 1134, 1141 (1986), we stated that: The requirement that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts" requires a consideration of two factors: (1) The availability of other evidence on a particular point; and (2) whether such other evidence can be procured through reasonable efforts. * * * As to the first factor, we note that not all of the borrowers from whom Valdes and Yeager obtained Borrower Letters on behalf of CINB had maintained or could locate books and records regarding the withholding and payment over of tax on CINB's behalf. Further, *489 there is no evidence in the record regarding what, if any, other evidence on that point was available from foreign tax authorities. As to the second factor, we conclude that CINB's efforts to substantiate the foreign tax credits claimed with respect to net quoted loans yielded the most probative evidence on that point which could be procured through reasonable efforts. First, no provision in the net quoted loan agreements required borrowers to provide CINB with documentation of withholding and payment over of tax on its behalf. [10] There is ample evidence in the record indicating that certain borrowers were reluctant to provide CINB with any documentation since they had no obligation to do so. Second, CINB sought to substantiate foreign tax credits by obtaining original tax receipts or copies of those receipts from the borrowers. We think it significant that CINB attempted to obtain documentation in the form of Borrower Letters only after the unavailability of tax receipts became apparent. Third, the other evidence in question, i.e., the books and records of borrowers and foreign tax authorities and the persons who could testify about matters recorded therein, is beyond the subpoena *490 power of the Court. Karme v. Commissioner, 73 T.C. 1163, 1181 (1980). [11] Fourth, we are convinced that Valdes had good reason not to request access to or copies of the books and records of the borrowers whom he visited on behalf of CINB. He testified that such a request would likely have gotten him "thrown out of their offices" because those borrowers were under no obligation to open their books and records to CINB. Yeager testified that he refrained from requesting access to or copies of the books and records of the borrowers whom he visited because "in many instances, we'd already determined, based on the beginning conversation that they did not have, or that they had not been able to locate records documenting the tax receipts." We think it likely, however, that the Asian borrowers who had books and records would have been reluctant to open them to CINB much the same as the South American and Mexican borrowers visited by Valdes. In view of the rigor with which the requirements of the residual exceptions should be construed, we refuse to apply *491 such exceptions when it would not be difficult to go behind the proffered hearsay to reach more solid evidence or when the proffered hearsay is merely "cumulative and, therefore, no more probative, than other evidence already in the record." (Fn. ref. omitted.) Goldsmith v. Commissioner, supra at 1141-1142. However, the voluminous record in this case chronicles CINB's efforts to procure stronger evidence, and those efforts impress us as being reasonable given the enormity of the task and the constraints under which CINB was operating, not all of which have been described in the preceding paragraphs. As stated by the court in United States v. Boulahanis, 677 F.2d 586, 589 (7th Cir. 1982), cert. denied 459 U.S. 1016 (1982), the residual exceptions do "not require that hearsay evidence be essential in order to be admissible," but instead "it is enough that it is the most probative evidence reasonably availabe on a material issue in the case." (Emphasis added.) Moreover, the Borrower Letters are not cumulative of other evidence already in the record; rather, CINB procured such letters because its efforts to procure other evidence on the same point failed. Interests of Justice
Finally, *492 the Borrower Letters are to be admitted only if so doing best serves the general purposes of the Federal Rules of Evidence [12] *493 and the interests of justice. We conclude that admission of the Borrower Letters into evidence will serve the purposes of such rules and the interests of justice by increasing the likelihood of ascertaining the truth about the withholding and payment over of tax on CINB's behalf. The residual exceptions are designed to come into play only when there is a need for the proffered hearsay evidence in order to ascertain the truth in a case. We believe that there is such a need here because the Borrower Letters are necessary to permit a full and fair examination of the net quoted loan transactions which are at issue. Accordingly, we hold that the following exhibits are admissible under the residual exceptions to the hearsay rule: 106-DB(1-4), 152-EV(2), 163-FG(1), and 353-MN(1-3). [13]
Hearsay Within Hearsay
Respondent contends that two of the Borrower Letters upon which we must rule, Exhibits 152-EV(1) and 152-EV(3), are based upon hearsay and, therefore, constitute hearsay within hearsay. [14] Rule 805 makes it clear that hearsay within hearsay is not admissible unless each of the hearsay components independently satisfies an exception to the hearsay rule. See, e.g., United States v. Ruffin, 575 F.2d 346, 357 (2d Cir. 1978). Thus, a statement in a Borrower Letter based *494 upon statements made by another person constitutes multiple hearsay if it is offered for the truth of the matters asserted by such other person. First, the statement made in a Borrower Letter is hearsay. Second, the statements made by such other person to the person who signed the Borrower Letter are hearsay. Unless petitioner, as proponent of the Borrower Letters in question, shows that those letters can overcome hearsay objections at both levels they are not admissible evidence. Petitioner apparently relies upon the residual exceptions to overcome the multiple hearsay because it advances no *495 separate argument for the admission of those particular Borrower Letters. However, such letters differ from the other Borrower Letters in that they were not obtained directly from the borrowers who purportedly withheld and paid over tax on CINB's behalf; rather, CINB obtained such letters from corporations which subsequently acquired those borrowers. The relative remoteness of the officers of the successor corporations from the withholding tax practices of the predecessor borrowers resulted in those officers basing their Borrower Letters, at least in part, on discussions with employees of the successor corporations who had also been employees of the borrowers. Thus, those Borrower Letters lack the trustworthiness which we found with respect to Borrower Letters obtained from high ranking officers of borrowers who were authorized to issue such letters because of their responsibility for or familiarity with the withholding tax practices of the borrowers which they represented. Although the residual exceptions applied to Borrower Letters without an additional level of hearsay, we cannot apply those exceptions to Exhibits 152-EV(1) and 152-EV(3) absent a showing that the specific requirements *496 are satisfied with respect to the second level of hearsay. No such showing has been made by petitioner. Therefore, we hold that Exhibits 152-EV(1) and 152-EV(3) constitute inadmissible multiple hearsay. Petroleos Mexicanos Letters
Background
Petroleos Mexicanos (PeMex) is a decentralized agency of the Mexican government which exercises an oligopoly over the extraction and sale of petroleum in Mexico. Although the Mexican government exempted PeMex from the payment of income tax, it collects tax from PeMex under a special tax regime. PeMex is also obligated to comply with certain laws regarding the withholding of income tax, including that due on payments of interest on loans extended to it by lenders outside of Mexico. CINB's efforts to substantiate the withholding and payment over of tax by PeMex on its behalf took place in a number of phases and resulted in a succession of letters from PeMex in that regard, only some of which are subject to objections. CINB's foreign tax credit documentation efforts with respect to PeMex date back to the years of the net quoted loan study. When Valdes became involved in 1987 he found what he believed to be contradictory letters regarding the *497 withholding and payment over of tax by PeMex on CINB's behalf. Valdes visited PeMex on approximately seven occasions during 1987 and 1988. On his initial visits, Valdes discussed those prior letters with the PeMex representatives whom he met and he sought clarification of PeMex's withholding tax practices with respect to net quoted loans. His visits resulted in PeMex providing CINB with a letter dated March 23, 1987, on that subject. Valdes subsequently returned to PeMex and explained that CINB's dispute with the Internal Revenue Service was ongoing. He inquired into whether one or more officers of PeMex would be willing to testify at a trial if necessary. After being informed that PeMex officers could not testify, Valdes checked into the possibility of obtaining a letter specifically indicating that PeMex had paid tax on CINB's behalf. His request prompted a letter from PeMex dated May 25, 1988, in which representations were made regarding the payment of withholding tax by PeMex on CINB's behalf with respect to net quoted loans outstanding during the years 1977 through 1979. PeMex sent a letter dated March 10, 1989, to CINB withdrawing the letter dated May 25, 1988. The March *498 10, 1989, letter provided in pertinent part that: Under the method of taxation which has been applicable to Pemex for over 25 years, Pemex has not been required to withhold or pay any Mexican federal or local income taxes, including the withholding of such taxes, on interest paid to nonresidents of Mexico. Valdes made another visit to PeMex to discuss the contradictions raised by this latest letter. The officers of PeMex with whom he met informed him, for the first time, that PeMex did not pay withholding tax directly. Valdes was told that PeMex had an informal arrangement with the Mexican government pursuant to which such tax was indirectly paid as part of the special tax regime. At trial, PeMex's New York counsel, Leslie B. Samuels (Samuels), testified that an "informal administrative understanding" existed between PeMex and the Mexican government pursuant to which withholding tax was not paid directly by PeMex even though it had an obligation to withhold and pay over such tax. Objections
Petitioner reserved hearsay and competency objections to handwritten notes which appear on the face of Exhibit 289-KC, a letter from PeMex dated December 3, 1982. There is no evidence in the *499 record regarding those notes nor any argument with respect to those objections. Respondent, as proponent of the handwritten notes, has not shown such notes to be admissible over petitioner's hearsay and competency objections. We therefore sustain those objections. Accordingly, we receive Exhibit 289-KC into evidence but the handwritten notes which appear on its face will be disregarded. Respondent reserved a hearsay objection to the Borrower Letter dated May 25, 1988, which is a part of both Exhibit 276-JP and Exhibit 291-KE(1-2). With respect to that Borrower Letter, we must decide whether it is admissible under the residual exceptions even though it was withdrawn by the letter dated March 10, 1989. Respondent argues that "A letter offered to this Court that states that Pemex paid the withholding taxes in question, which is withdrawn by its signatory and replaced with a letter that states that Pemex never paid the tax, is untrustworthy and inadmissible under Rule 803(24)." We disagree with respondent because we do not believe that the withdrawal of the May 25, 1988, letter makes such letter untrustworthy. [15] PeMex's Deputy Manager of Financing, Carlos Diaz (Diaz), executed both *500 letters and he offered no explanation in the later letter for why the Borrower Letter dated May 25, 1988, was being withdrawn. In the absence of such an explanation, we cannot assume that such letter was withdrawn because it was untrustworthy. We do not think that either respondent or petitioner would have us find that only certain letters executed by Diaz, i.e., those letters which appear to cut in their favor, are sufficiently trustworthy to warrant admission under the residual exceptions while other letters which he executed on the same subject are inadmissible hearsay. Rather, we think it appropriate to consider all such letters together with the other evidence in the record which bears on the matters addressed therein. Accordingly, we hold that the Borrower Letter dated May 25, 1988, is admissible under the residual exceptions to the hearsay rule. [16] *501 In the First Supplement to Third Stipulation of Facts (Net Loan Issues), petitioner reserved hearsay and competency objections to the letters from PeMex dated March 10, 1989, Exhibits 297-KK(2) and 298-KL(3), [17] *502 and April 5, 1989, Exhibit 300-KN(3). Petitioner also reserved a relevancy objection to the April 5, 1989, letter. Each of those letters withdraws an earlier letter from PeMex regarding the payment of withholding tax by it on CINB's behalf. The March 10, 1989, letter withdraws the Borrower Letter dated May 25, 1988, regarding net quoted loans outstanding during the years 1977 through 1979 and the April 5, 1989, letter withdraws a letter almost identical to the May 25, 1988, Borrower Letter except such letter pertains to net quoted loans outstanding during tax years not before this Court. We consider petitioner to have abandoned its objections to those particular letters, Exhibits 297-KK(2), 298-KL(3), and 300-KN(3), and the cover letters from Samuels which accompanied them, Exhibit 298-KL(2) and Exhibit 300-KN(2), because it offered no argument in support of its position in either its pretrial memorandum or in the memorandum of law which we requested each party to submit specifically addressing such hearsay and competency objections. Moreover, petitioner's counsel conceded at trial that, "as with our two letters [18] *503 from PeMex, we would feel that all of these documents should be admitted into the record of trial." We could not agree more. The receipt in evidence of each of the successive letters from PeMex will facilitate the resolution of contradictions and inconsistencies raised by such letters and allow a full and fair examination of the purported payment of tax by PeMex on CINB's behalf. Accordingly, we hold that the letters from PeMex identified as Exhibits 297-KK(2), 298-KL(3), and 300-KN(3) are admissible. [19]
Admissibility of Attached Schedules
Respondent raised competency and hearsay objections to certain schedules prepared during trial preparation by representatives of CINB and petitioner's counsel which purportedly show, inter alia, the amount of interest withheld and paid over on behalf of CINB. Respondent argues that the persons involved in the preparation of such schedules were not competent under Rule 602[20] to make factual representations regarding the amount of "taxes withheld" or "taxes paid" by borrowers. Respondent further argues that such schedules constitute hearsay which fails to meet the trustworthiness requirements of the residual exceptions. In support of his argument regarding untrustworthiness, respondent stresses the asserted lack of personal knowledge on the part of those preparing the schedules and the fact that petitioner conceded that some schedules *504 contained errors. We assume that the schedules in question were constructed by applying foreign tax rates to the net interest paid or accrued on the principal balance of outstanding net quoted loans as reflected in CINB's books and records, with an appropriate gross-up adjustment. The persons preparing such schedules merely made mathematical calculations of the amount of tax which should have been withheld and paid over on CINB's behalf based on those factors. [21] *505 Thus, we agree that the persons involved in the preparation of schedules purporting to show the amount of "taxes withheld" or "taxes paid" with respect to net quoted loans lacked the personal knowledge necessary to make such representations. We do not, however, agree that that necessarily precludes those schedules from being admitted into evidence, particularly where borrowers made them a part of their Borrower Letters. With the exception of Exhibit 234-HY(2), borrowers indirectly incorporated the schedules in question, Exhibits 106-DB (2-4), 152-EV(1-3), 275-JO, 276-JP, 290-KD(2), 291-KE(2), and 353-MN(1-3), into their Borrower Letters by reference therein and/or attachment thereto. [22] *506 Accordingly, we do not view such schedules as documents separate and apart from the letters to which borrowers attached them. Rather, we consider the attached schedules to be an integral part of the Borrower Letters because such schedules are relevant to explain those letters and to place portions of them in context. Thus, our rulings with respect to the admissibility of Borrower Letters also constitute rulings on the admissibility of the schedules attached thereto. Since respondent did not reserve an objection to the letter from PeMex dated March 23, 1987, Exhibit 275-JO and Exhibit 290-KD(1), [23] we overrule his objections to the schedule attached to such letter. Because we believe that the attached schedules are generally trustworthy, the conceded and purported errors in them will be taken account of in the process of weighing the evidence rather than in determining admissibility. Such schedules will not however be treated as independent evidence of payment of tax on CINB's behalf; rather, we will treat such schedules as evidence of the amount of tax which should have been withheld and paid over on CINB's behalf. In that connection, we also note that our decision regarding the admissibility of the Borrower Letters, including those letters with schedules attached thereto, does not constitute a decision regarding the sufficiency *507 of such evidence to prove payment of tax by borrowers on behalf of CINB. The other schedule to which respondent objects, Exhibit 234-HY(2), is not incorporated into the letter which it accompanies. We concluded that borrowers incorporated schedules into their letters only where the record shows that those borrowers were provided with such schedules prior to drafting their letters and that they returned the schedules to CINB attached to those letters. There is no such showing in the record with respect to Exhibit 234-HY(2). Thus that schedule is not admissible in conjunction with such letter. However, respondent used Exhibit 234-HY(2) in an attempt to prove that "inaccurate and misleading information [was] presented to borrowers for purposes of securing borrower letters." [24] *508 Accordingly, we hold that respondent waived his objections to Exhibit 234-HY(2) by using it for his own purposes, United States v. Silvers, 374 F.2d 828, 832 (7th Cir. 1967), cert. denied 389 U.S. 888 (1967), and therefore that that schedule is admissible.
Relevance Objections
Petitioner reserved relevance objections to Exhibits 238-IC, 239-ID, 259-IY, 294-KH, and 295-KI. Each of those exhibits consists of various documents generated by or submitted to Donald Gavin, an attorney for the Department of Justice who represents the United States in a refund suit which petitioner filed in the United States District Court, Northern District of Illinois. Although petitioner's refund suit pertains to earlier tax years, it involves issues substantially similar to issues now before this Court. Petitioner also reserved relevance objections to Exhibits 300-KN(2-3), a cover letter from Samuels to CINB and a letter from PeMex to CINB withdrawing an earlier letter pertaining to the payment of withholding taxes by PeMex on CINB's behalf during years which are the subject of the refund suit. The last exhibit to which petitioner reserved a relevance objection is Exhibit 302-KP, an internal memorandum issued by a CINB representative to CINB's credit policy committee on April 15, 1983. Rule 401 defines relevant evidence as "evidence *509 having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In order to be deemed relevant, proffered evidence need not prove an ultimate fact in issue; it must only tend to make the existence of any fact more or less probable. Upon reviewing the exhibits to which petitioner's relevance objections are outstanding, we find such exhibits relevant within the meaning of Rule 401, and thus petitioner's objections are overruled and the exhibits are hereby made a part of this record. Untranslated Financial Statements
Respondent reserved several objections to the receipt in evidence of Exhibit 235-HZ(1-3) which consists of the financial statements of Comision Federal de Electricidad Financial (CFE), a government-owned Mexican utility company, for the years 1977, 1978, and 1979 and Exhibit 358-MS(1-2), which consists of two pages of CFE's audited financial statements for each of the years 1981 and 1982. Because those financial statements have not been translated, and respondent objected on that ground, we need not determine their admissibility over respondent's other *510 objections. The untranslated financial statements of CFE cannot properly be made a part of this record because neither respondent nor this Court reads the language in which those financial statements are written. To reflect the foregoing, An appropriate order will be issued. Footnotes
1. The remaining issues were described in that order as "Non-Iranian Loss" issues.↩
2. In some instances, borrowers with gross quoted loans outstanding remitted interest payments at the gross quoted rate, paid the corresponding withholding tax, and then submitted a tax receipt pursuant to which reimbursement was made by CINB.↩
3. In order to determine the gross-up adjustment required with respect to a net quoted loan, the net quoted interest rate must be "grossed up" to reflect the assumption by the borrower of the obligation to pay tax imposed by the borrower's country on the lender with respect to its interest income. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929); sec. 1.901-2(f)(2)(ii) Example 1, Income Tax Regs. Thus, for example, if a net quoted loan agreement required an interest payment of $ 10 net of foreign tax, and the tax rate was 20 percent, then the gross-up adjustment would be $ 2.50 so that the tax would be computed on an interest payment of $ 12.50 ($ 12.50 X 20% = $ 2.50). Such a situation results in interest income in the amount of $ 12.50 because the lender receives $ 10 directly from the borrower and $ 2.50 indirectly by virtue of the borrower's payment of tax imposed on the lender.
4. Although borrowers never actually withheld tax from interest payments made to CINB under net quoted loan agreements, the assumption by borrowers of CINB's obligation to pay foreign tax served the same purpose. For that reason, we will hereinafter use "withholding and payment over" as a shorthand reference to the purported assumption and discharge by borrowers of the obligation to pay foreign tax imposed on CINB with respect to interest income from net quoted loans.
5. Several borrowers indicated in their written certifications that interest paid to CINB was not subject to withholding tax, i.e., no foreign tax was imposed on the interest payments made to CINB by those particular borrowers.↩
6. Unless otherwise indicated, all Rule references are to the Federal Rules of Evidence applicable to this proceeding pursuant to Rule 143(a) of the Tax Court Rules of Practice and Procedure and sec. 7453 of the Internal Revenue Code↩. 7. The residual exceptions provide that the hearsay rule does not exclude: A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant. Rules 803(24) and 804(b)(5)↩.
8. Cecilia M. Kurtzweil, CINB's legal documents supervisor, certified such schedules as accurate without independently verifying the amounts presented therein.↩
9. Although certain net quoted loan agreements required borrowers to provide CINB with tax receipts, we assume that those borrowers from whom documentation was being sought by Valdes and Yeager were under no such obligation.↩
10. See n. 9, supra↩. 11. See also Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23, affd. 820 F.2d 1543↩ (9th Cir. 1987).
12. The general purposes of the Federal Rules of Evidence are set forth in Rule 102 as follows: These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined. 13. Petitioner's counsel elicited testimony regarding each Asian Borrower Letter in turn before moving for the admission of those letters into evidence. Because petitioner's counsel neither elicited testimony regarding Exhibit 129-DY nor moved for its admission at the same time which he moved for the admission of the other Asian Borrower Letters we conclude that petitioner conceded the inadmissibility of that exhibit over respondent's objections. For substantially the same reasons as applied with respect to the South American Borrower Letters, we conclude that petitioner also conceded the inadmissibility of Exhibit 163-FG(2).↩
14. Exhibit 152-EV(1) provides in pertinent part that: Based on available records and discussions with employees who have some knowledge of the business of the former CDCP, we can state that it was the custom and practice of the said company to comply with the Philippine Withholding Tax laws and to remit any taxes withheld to the proper government authority. Exhibit 152-EV(3) provides in pertinent part that: We have confirmed with present employees of BPI who were employees of CBTC that on all net-quoted loans it was the business practice and custom of CBTC to pay all withholding taxes as due.↩
15. Nor do we agree with respondent's interpretation of the meaning of the successive letters which CINB received from PeMex. However, we leave the interpretation of such letters for another day since we are here concerned only with their admissibility. ↩
16. Our ruling constitutes a ruling with respect to Exhibit 276-JP and Exhibit 291-KE(1-2) since the same objection is outstanding with respect to the same letter, i.e., the Borrower Letter dated May 25, 1988, which appears in both of those exhibits.
17. We do not consider the objections to Exhibit 297-KK(2) and Exhibit 298-KL(3) separately since the same objections are outstanding with respect to the same letter, i.e., the letter dated March 10, 1989, which appears in both of those exhibits.
18. We assume that the "two letters" which petitioner's counsel refers to are the letter dated March 23, 1987, to which respondent has no objection and the letter dated May 25, 1988, to which respondent objects. 19. Because we determined that petitioner abandoned its objections to these exhibits we need not decide whether such exhibits are admissible under the hearsay exceptions set forth in Rule 804(b)(3) or Rule 804(b)(5)↩ as contended by respondent.
20. Rule 602 provides in pertinent part that: A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself.↩
21. Whether the borrowers actually withheld and paid over the amount of tax set forth in such schedules is a question which we leave for another day.
22. With respect to Exhibit 106-DB(1) and Exhibit 163-FG(1), borrowers incorporated schedules directly into their Borrower Letters instead of attaching the schedules prepared and provided by CINB. Thus, respondent's competency objections are unfounded, and his hearsay objections are redundant since those letters, which necessarily include the schedules incorporated directly therein, are admissible under the residual exceptions to the hearsay rule. 23. We do not consider the objections to Exhibits 275-JO and 290-KD(2) separately since the same objections are outstanding with respect to the same schedule which appears in both of those exhibits.↩
24. Respondent indicated in his Supplemental Trial Memorandum (Net Loan Issues) that he intended to make such use of all of the schedules. At trial, respondent followed through on that intention by cross-examining a representative of CINB at length about the accuracy of Exhibit 234-HY(2).